AO 106 (Rev. 04/10) Application for a Search Warrant

## UNITED STATES DISTRICT COURT
### for the
Eastern District of Virginia

FILED

MAY 5 2023

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF | |
| INFORMATION ASSOCIATED WITH THE ACCOUNTS:  ) | Filed Under Seal |
| marthazeferino@hotmail.com                         ) | Case No. 2:23-sw 84 |
| AND                                                ) | |
| josemari301@hotmail.com                            ) | |
| THAT ARE STORED AT PREMISES                        ) | |
| CONTROLLED BY THE MICROSOFT                        ) | |
| CORPORATION                                        ) | |

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**See Attachment A**

Located in the Western District of Washington there is now concealed:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime.
- ☒ contraband, fruits of crime, or other items illegally possessed.
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description |
|---|---|
| 18 U.S.C § 1546(a) | Fraud and misuse of visas, permits, and other documents |
| 8 U.S.C § 1324(a)(1)(A)(ii) & (iii) | Harboring certain aliens |
| 18 U.S.C § 1028(a)(1) & (4) | Fraud and related activity in connection with identification documents, authentication features, and information |
| 18 U.S.C. § 1589(a)(3) | Forced labor |
| 18 U.S.C. § 1592(a)(1) | Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor |
| 18 U.S.C. § 1594(b) | Conspiracy to engage in forced labor and unlawful conduct with respect to documents |

The application is based on these facts:  **See Affidavit.**

- ☒ Continued on the attached sheet.
- ☐ Delayed notice of ___days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S .C. § 3103a, the basis of which is set forth on the attached sheet.

REVIEWED AND APPROVED:

*Applicant's signature*

/s/

E. Rebeca Gantt
Assistant United States Attorney

HSI Special Agent Kristen Brewer

Date and Time: <u>May 5,2023@ 2:00PM</u>  2:12 p.m.

_____
*Judge's signature*

City and state: <u>Norfolk, VA</u>

<u>United States Magistrate Judge Robert J. Krask</u>
*Printed name and title*



IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ACCOUNTS: | |
| marthazeferino@hotmail.com and josemari301@hotmail.com | Case No. 2:23-sw-____ 8 4 _____ **Filed Under Seal** |
| THAT ARE STORED AT PREMISES CONTROLLED BY THE MICROSOFT CORPORATION | |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Kristen Brewer, a Special Agent with the United States Department of Homeland

Security, Homeland Security Investigations ("HSI"), being duly sworn, depose and state as

follows:

### Introduction and Agent Background

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant for information associated with e-mail accounts

marthazeferino@hotmail.com (hereinafter **SUBJECT ACCOUNT1**) and

josemari301@hotmail.com (hereinafter **SUBJECT ACCOUNT2**) (collectively, the "**SUBJECT**

**ACCOUNTS**") that are stored at premises owned, maintained, controlled, or operated by

Microsoft Corporation, an email and cloud storage provider headquartered at Microsoft

Corporation at One Microsoft Way, Redmond, WA 98052 ("Microsoft"). The information to be

searched is described in the following paragraphs and in Attachment A. I seek a search warrant

requiring Microsoft to disclose to the government copies of the information (including the

1

content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I have been a Special Agent with HSI since May 2011. I am an investigator and law enforcement officer of the United States within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a federal agent empowered to conduct investigations and engaged in enforcing the federal criminal statutes. As part of my employment as a Special Agent, I have successfully completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and the Homeland Security Investigations Special Agent Training (HSISAT) in Glynco, Georgia.

3.      I am a Criminal Investigator and Law Enforcement Officer of the United States who is empowered by federal law to conduct investigations and make arrests for offenses enumerated in Titles 8, 18, and 19, of the United States Code (U.S.C.). Since May 2011, I have conducted investigations including narcotics smuggling, alien smuggling, immigration violations, firearms smuggling, human trafficking, and child sexual exploitation.

**Property to be Searched**

4.      This affidavit is submitted in support of a request for a search warrant for information associated with the **SUBJECT ACCOUNTS**, which are associated with Martha ZEFERINO Jose (hereinafter "ZEFERINO").

5.      This affidavit is based on my personal observations, my training and experience, and my conversations with other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included every fact known to me about this investigation. I have set forth only the facts that I believe are necessary to establish

2

probable cause to believe the **SUBJECT ACCOUNTS** contain evidence of crimes committed by ZEFERINO and others.

**Pertinent Federal Criminal Statutes**

6.    Based upon the information contained in this affidavit, I submit that probable cause exists to believe that in the **SUBJECT ACCOUNTS** there exists evidence, fruits, and instrumentalities of the following criminal offenses being carried out by ZEFERINO and others (collectively, the "**SUBJECT OFFENSES**"):

- 18 U.S.C. § 1546(a) - Fraud and misuse of visas, permits, and other documents

- 8 U.S.C. § 1324(a)(1)(A)(ii) & (iii) - Harboring certain aliens

- 18 U.S.C. § 1028(a)(1) & (4) - Fraud and related activity in connection with identification documents, authentication features, and information

- 18 U.S.C. § 1589(a)(3) - Forced labor

- 18 U.S.C. § 1592(a)(1) - Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor

- 18 U.S.C. § 1594(b) - Conspiracy to engage in forced labor and unlawful conduct with respect to documents

7.    The legal authority for this search warrant application for information from Microsoft is derived from 18 U.S.C. §§ 2701–2711, entitled "Stored Wire and Electronic Communications and Transactional Records Access." Section 2703(a) provides in relevant part as follows:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of an electronic communication that is in electronic storage in an electronic

3

communications system for one hundred and eighty days or less, only pursuant to a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant. A governmental entity may require the disclosure by a provider of electronic communications services of the contents of an electronic communication that has been in electronic storage in an electronic communications system for more than one hundred and eighty days by the means available under subsection (b) of this section.

8.  18 U.S.C. § 2703(b) provides in relevant part as follows:

   (1) A governmental entity may require a provider of remote computing service to disclose the contents of any wire or electronic communication to which this paragraph is made applicable by paragraph (2) of this subsection –

      (A) Without required notice to the subscriber or customer, if the governmental entity obtains a warrant issued under the Federal Rules of Criminal Procedure or equivalent State warrant.

   (2) Paragraph (1) is applicable with respect to any electronic communication that is held or maintained on that service –

      (A) On behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and

      (B) Solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.

9.   Specifically, the Court is "a district court of the United States" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. Microsoft accepts out-of-state and out-of-district service of subpoenas, court orders, and search warrants by e-mail without the presence of a law enforcement officer. Accordingly, I will

4

execute the requested search warrant by e-mail to the custodian of records at the Microsoft, and I ask that the data to be copied or obtained outside of the presence of a law enforcement officer. I anticipate Microsoft will produce the requested records to me in electronic format accompanied by a signed authentication letter via e-mail or on electronic media via U.S. Mail.

10.     This investigation involves offenses within the jurisdiction and proper venue of the United States District Court for the Eastern District of Virginia, as more fully articulated below.

### Overview of the H-2A Visa Process

11.     From my immigration training, I know that foreign nationals cannot work for pay in the U.S. without prior authorization from the U.S. government.

12.     Foreign nationals may obtain work authorization in the U.S. through a nonimmigrant visa petitioned for on their behalf by a qualifying sponsoring U.S. employer. A nonimmigrant visa allows a foreign national to enter the U.S. temporarily, to fulfill a specific purpose.

13.     One mean by which foreign nationals can obtain authorization to work for pay in the U.S. is by obtaining an H-2A nonimmigrant visa through a U.S. agricultural employer. The H-2A visa allows a foreign national to work in the U.S. for a maximum uninterrupted period of three years.

14.     To apply for the H-2A visa, the prospective U.S.-based employer must submit information to the Department of Labor ("DOL"), United States Citizenship and Immigration Services ("USCIS"), and, in most cases, Department of State ("DOS").

15.     The DOL allows an H-2A Labor Contractor ("H2ALC") to file as an employer on an ETA 9142; however, the H2ALC must be limited to a single area of intended employment. Prior to filing an ETA 9142, the H2ALC is required to be registered under the Migrant and

Seasonal Agricultural Worker Protection Act ("MSPA") as a Farm Labor Contractor ("FLC") and obtain a Certificate of Registration prior to engaging in any farm labor contracting activity. The FLC certificate of registration identifies the specific farm labor contracting activities the H2ALC is authorized to perform as an FLC.

16.     An H2ALC must submit the name and location of each agricultural business to which the H2ALC expects to provide workers, the expected beginning and ending dates when the H2ALC will be providing the workers at each site, and a description of the crops and activities the workers are expected to perform at each site.   The H2ALC must also submit a copy of each work contract agreement between the H2ALC and the agricultural business to which they expect to provide workers.

17.     An H2ALC must obtain and submit an original surety bond with the application. The surety bond must be written to cover the liability incurred during the term of the work contract period listed on the application and must remain in effect for a period of at least two (2) years from the expiration date of the labor certification.  The amount of the surety bond is dependent on the number of employees requested.  The bond must be payable to the Wage and Hour Division Administrator.

18.     The prospective employer or its agent must file a DOL Form 970 Job Order ("Job Order") with the State Workforce Agency ("SWA") in the area of intended employment.  The Job Order lists the work hours and location where the intended H-2A workers will be employed. This Job Order causes the SWA to begin attempts to recruit U.S. workers (i.e. U.S. citizens or Lawful Permanent Residents) for the vacant agricultural jobs by the employer.  The employer themselves must also typically attempt their own recruitment efforts by posting newspaper

6

advertisements for U.S. workers in a newspaper in the area of intended employment.  These steps are performed to adequately test the local jobs market for domestic labor.

19.    Once the Job Order has been placed, and recruitment efforts for U.S. workers exhausted, the employer/agent can submit a DOL Form 9142, Application for Temporary Employment Certification, to the DOL either by mail or internet submission.  In order to submit electronically, an employer/agent must create a portal account that allows the employer to prepare and submit applications for labor certifications 24 hours a day and 7 days a week.  As part of the registration process, an employer/agent must provide a valid email address.  DOL utilizes the email address to efficiently communicate with the employer/agent on the status of the application(s).  Whether mailed or remitted via internet, the ETA 9142 is received at the DOL's Chicago National Processing Center (NPC) located at 11 West Quincy Court, Chicago, IL.   The ETA 9142 lists, among other things, steps taken to recruit U.S. workers, proffered wages to the intending H-2A workers and specific work locations, including worksite addresses.  The DOL cannot certify (i.e. approve) the ETA 9142 until the prospective employer has demonstrated that there are no sufficient able, willing, and qualified U.S. workers and that U.S. wages will not be adversely affected by the intending H-2A beneficiaries.  If submitted electronically, the ETA 9142 does not require an original signature at the time of submission.  Before the ETA 9142 can be forwarded onto the DHS for final approval, it must be signed by both the U.S employer and their agent/preparer (if application) under penalties of perjury.

20.    Once the ETA 9142 is certified, the U.S. employer submits a DHS Form I-129, Petition for Nonimmigrant Worker ("Petition") to USCIS for final adjudication.  The petition must be sent, via mail, to one of two USCIS service centers through the United States.  The Petition lists, among other things, the wage levels and specific work locations where the

7

intending H-2A's will be placed.  Both the U.S. employer and their agent/preparer under penalties of perjury must also sign the Petition.  A Petition may list multiple nonimmigrant workers.

21.     Upon receiving the USCIS approval, the U.S. employer will be notified that their intending H-2A beneficiaries can present themselves in person to the nearest U.S. Embassy or Consulate for a visa interview by a DOS official.  Although the foreign national does not have to sign the ETA 9142 or petition under penalties of perjury, they are required to provide a fingerprint certifying their visas are true and correct under penalties of perjury at the time of the visa interview abroad.

22.     Once approved, the H-2A visa is affixed to the foreign national's passport, which the individual can present to U.S. Customs and Border Protection officials at any U.S. port of entry to apply for admission as an H-2A worker.

23.     Federal regulations prohibit employers, agents, attorneys, or recruiters from collecting any money from foreign nationals for fees associated with the program to include the H-2A ETA 9142 filing fees, Petition filing fees, recruitment fees or any fees to allow the person to apply for the H-2A visa on a certain Petition prior to or after the approval of a Petition.

24.     Employers must also provide housing for workers at no cost and transportation to and from their home countries.  Employers may charge employees a DOL-published rate for meals but must offer at least three daily meals if cooking faculties are not provided.

25.     Employers must comply with all applicable laws and regulations, including the prohibition against holding or confiscating workers' passports or other immigration documents.

26.     USCIS and DOL maintain their own files with some overlapping documentation. Files for the applications for H2As maintained by USCIS are referred to as Petition files and are

provided with a Petition Number (P#). Files for the applications for H2As maintained by DOL are referred to as Labor Condition Application (LCA) with its own unique file number.

## Probable Cause

27.     In April 2022, HSI received information about a farm labor contract company ("FLC"), Las Princesas, located in North Carolina and owned by ZEFERINO.  ZEFERINO petitions for agricultural workers through the H2A program to come from Mexico to the United States to work for Las Princesas in the agricultural sector in Eastern Shore of Virginia and North Carolina.  As described in more detail below, the investigation has revealed that various petitions and supporting documentation signed under penalty of perjury were submitted to DHS and DOL containing materially false and fraudulent information.

28.     Within the documentation I reviewed in the DOL and USCIS files, there are two E-mails listed as point of contact for Las Princesas. One is specific to ZEFERINO, listed as **SUBJECT ACCOUNT1**, and the other is for a company that is an agent operating on behalf of Las Princesas. During the course of the investigation, I further observed ZEFERINO use **SUBJECT ACCOUNT2** to send emails to a business that had contracted Las Princesas to provide laborers.  Some of the e-mails that were reviewed, contained attachments of false legal permanent residence (LPR) identification cards with photographs of the workers. It was later determined the identities in the LPR cards did not match the actual identification information of the workers who were pictured in those identities.

29.     To date, five (5) victims have been referred by non-governmental organizations to HSI and Department of Labor – Office of the Inspector General (DOL-OIG). They will be referred to hereinafter as VICTIM1, VICTIM 2, VICTIM3, VICTIM4, and VICTIM5. VICTIM1, VICTIM2, and VICTIM3 were petitioned to work at Tankard Nurseries in

9

Nassawadox, Virginia in the Eastern District of Virginia.   Based on a review of the paperwork submitted by ZEFERINO to DOL and Department of Homeland Security (DHS), this was the only location in Eastern Virginia the workers were permitted to work under their H2A Visas.

30.      The investigation has revealed that once the victims arrived in Virginia, ZEFERINO confiscated their passports and other identity documents.  After the expiration of two of the victims' H2A visas, ZEFERINO relocated them to North Carolina and continued to have them work at unauthorized locations, expose them to substandard working and living conditions and provide them with fraudulent immigration documents and social security cards and/or copies of the documents so they could continue to work past their visa expiration date.

31.      During the interviews with VICTIM1, VICTIM2, VICTIM3, and VICTIM4, I reviewed either copies and or originals of the Visas that had been affixed in their Mexican passports. All Visas contained the Petitioner Name (PN) of LAS PRINCESAS CORP.

32.      VICTIM1, VICTIM2, and VICTIM4's Visas all listed a USCIS Petitioner Number (P#) ending in 8103. The corresponding DOL LCA file number ends in 3735. VICTIM3's Visa listed a USCIS Petitioner Number ending in 9831.  The corresponding DOL LCA file number ends in 3116.

VICTIM1

33.      In April and May 2022, I conducted interviews with VICTIM1. VICTIM1 disclosed he had come to the United States from Mexico on an H2A Visa. VICTIM1 identified the labor contracting company who petitioned for his visa as Las Princesas and identified the "boss" of the company as ZEFERINO. Through this petition, VICTIM1 was granted an H2A visa for a period of three (3) months from September 2021 through December 2021.

10

34.     VICTIM1 explained prior to coming to the United States, while still in Mexico, he learned about a potential employment opportunity through "Rogelio," later identified as Rogelio Santos SAN JUAN.  SAN JUAN referred VICTIM1 to a man located in Hidalgo, Mexico named "Pablo" later identified as Pablo Cordero HERNANDEZ.  The information VICTIM1 provided revealed that HERNANDEZ oversaw compiling a list of "eligible" workers in Mexico for potential employment with Las Princesas in the United States.

35.     VICTIM1 stated that he paid, as part of the visa process, what he described as an "attorney fee" of approximately 26,000 Mexican Pesos—approximately $1,300—and an additional $250 to obtain the visa. After receiving his H2A visa, VICTIM1 was transported by bus from Mexico to a hotel in Nassawadox, Virginia, in the United States.

36.     VICTIM1 stated when he arrived in Virginia, ZEFERINO and JEREMY Zeferino Jose, ZEFERINO's son, held a meeting with VICTIM1 and the group of workers he had traveled with from Mexico. During this meeting, ZEFERINO collected and confiscated VICTIM1's Mexican passport and provided the workers with a set of rules. Some of the rules provided by ZEFERINO include that they were not to smoke or drink, leave to go to the store, or approach or speak with hotel staff.

37.     After arriving in Virginia, VICTIM1 stated that he began work at a plant nursery, Tankard Nursery. While in Virginia, VICTIM1 and the rest of the group generally worked six days each week from approximately 7:00 a.m. to 6:00 p.m. with two ten-minute breaks and one thirty-minute break each day. JEREMY transported the workers to and from the worksite and provided them instructions on what to do each day. Las Princesas paid VICTIM1 by check each week.

11

38.     VICTIM1 stated that approximately one week after arriving in Virginia, the workers were taken to apply for their social security cards. He stated the entire group of 25 were driven to an office on the Eastern Shore in Virginia to apply for their social security cards. He stated they were transported in a white bus driven by JEREMY. VICTIM1 stated that he was required to pay $175.00 USD for the social security card, which card he never received.

39.     In December 2021, VICTIM1's visa expired. He believed he would be returning to Mexico, but instead VICTIM1 and other members of the group were transported by ZEFERINO from Virginia to North Carolina. Once in North Carolina, VICTIM1 was placed into substandard housing with no heat, no beds, and was not provided with winter appropriate blankets and clothing.

40.     After VICTIM1 arrived in North Carolina, ZEFERINO provided him with a photocopy of a social security card and permanent residence card. ZEFERINO explained to him that he was now out of status (immigration status) and he was to use this identity. ZEFERINO explained that he was not able to physically retain the fraudulent social security and permanent resident card but was provided with a photocopy of the identifications.

41.     During the interview with VICTIM1, a photograph of a photocopy of the false identities was provided to me, which included a social security card with the name, Antonio Rivera Catalina, SSN ending in 8932, and a legal permanent resident card with VICTIM1's photograph and the name: Antonio Rivera Catalina and Alien Registration Number (ARN) ending in 431. VICTIM1 explained that prior to leaving Virginia, JEREMY had taken the photograph of him that was observed on the fraudulent legal permanent resident card. Antonio Rivera Catalina is not VICTIM1's name and the DOB listed on the legal permanent resident card was not his. An initial query of government databases for ARN ending in 431 provided an

12

associated person with that identification number of Leonardo Ortega Rodarte, also not VICTIM1's name, with a date of birth different from the legal permanent resident card, and also different from VICTIM1's own.

42.     In or around the end of January 2022 to the beginning of February 2022, the group of workers could not find work in North Carolina. Due to this, ZEFERINO transported a portion of the group of workers from North Carolina to Florida to work at a location outside of Miami, Florida, to pick tomatoes. VICTIM1 recalled they only remained in Florida for a short duration of time due to a non-governmental organization contacting workers in the field. When ZEFERINO was made aware of this contact with the organization, she transported the workers from Florida back to North Carolina.

43.     VICTIM1 recalled while working on a tobacco farm in North Carolina he sustained an injury. He stated he slipped on water and hit a barrel and ultimately fractured his rib. JEREMY observed him fall, and VICTIM1 told JEREMY that he was in a lot of pain and that he was having difficulty breathing and requested medical care. JEREMY told him that he does not make these decisions and ZEFERINO would need to provide permission. VICTIM1 stated that he did not receive medical treatment at that time and was told it was because there were no workers to take his place.

44.     Approximately three days later, ZEFERINO took VICTIM1 to a clinic in North Carolina. He stated when ZEFERINO checked him in, he observed ZEFERINO provide the physical identification documents that he had been provided the photocopy, the social security card and permanent resident alien card.

45.     I received a subpoena return from the Agape Community Health Center in North Carolina. In that return was records for an encounter with a patient on March 2, 2022, with the

13

name Antonio Rivera Caterina (agent's note that they appeared to spell the last name incorrectly). The medical treatment was for a potentially fractured rib.

46.     VICTIM1 stated ZEFERINO was in possession of the medical records and was aware it was medically recommended that he not return to work for approximately 15 days. ZEFERINO required him to return to work the next day because there was no worker to replace him.

47.     VICTIM1 also generally described how ZEFERINO would threaten the workers at times with deportation—ZEFERINO would get irritated and tell the workers that she would call the police or immigration and that they would never work again.

48.     In May 2022, I was provided an e-mail from DOS. The e-mail was sent from an organization, Fair Food Standards Council, pertaining to a complaint they received from a worker they encountered in Homestead, Florida, in February 2022. This worker described experiencing a similar situation as VICTIM1, including paying illegal recruitment fees in Mexico, having his passport confiscated by "Martha" (ZEFERINO's first name), and being required to purchase a social security number to work. He identified the company as Las Princesas.  Fair Foods Standard Council provided a link to an H2 Job Board for Las Princesas Corporation. On the job board the following contact information is provided for Las Princesas Corporation, Telephone number: 252-375-5876, E-mail address: **SUBJECT ACCOUNT1**.

49.     I reviewed the documents within the DOL LCA and USCIS files associated with VICTIM1's H2A visa. In the job order file submitted to DOL corresponding to LCA file number ending in 3735 there is an e-mail file titled, "New Case Received Email.html".  The e-mail is dated August 5, 2021, and was electronically sent from DOL to cucu_celaya@comcast.net and **SUBJECT ACCOUNT1**.  In the body of the e-mail it is addressed to, "Las Princesas

14

Corporation, Martha Zeferino Jose, 414 Hackney Ave, Washington, North Carolina".  In the body of the email, it states it is a confirmation email that the FORM ETA790/790A covering the H2A visa classification for the position of Farmworkers and Laborers, Nursery was reviewed and submitted for processing.

50.     Located in DOL LCA file reference number ending in 3735 is the United States Department of Labor H-2A Agricultural Clearance Order Form ETA-790, *Section, A Job Offer Information, Period of Intended Employment* is the *3. Begin Date: 10/4/2021* and *4. End Date: 12/17/2021.*  I reviewed Form ETA-790, *Section, G. 1. Referral and Hiring Instructions* there are instructions provided to how prospective applicants may be considered for employment under the job order. This included contact information for the employer.  In this section, directions are provided to contact the career center for pre-employment screening before contacting the employer but those that are eligible will be made to "Jose Martha Zeferino (252)375-5876…". *Section G. 2. Telephone Number to Apply* (252) 375-5876, *Section G. 3. Email Address to Apply* **SUBJECT ACCOUNT1**.  I reviewed Form ETA-790, Addendum B, *Section C. Additional Place of Employment Information,* the name of the Agricultural Business is provided as "The Tankard Nurseries, Inc". The Place of Employment, "5002 Lanford Hwy, Exmore, Virginia…" In the section that allows a listing for Additional Place of Employment Information, "NONE" is provided.

VICTIM2

51.     In July 2022, I conducted an interview with VICTIM2. VICTIM2 disclosed he had come to the United States from Mexico on a H2A Visa. VICTIM2 identified the labor contracting company that petitioned for his visa as Las Princesas and the "boss" of the company

15

as ZEFERINO. Through this petition, VICTIM2 was also granted an H2A visa for a period of three (3) months from September 2021 through December 2021.

52.     VICTIM2 explained he had been made aware of the job opportunity while in Mexico through SAN JUAN. He stated that SAN JUAN referred him to HERNANDEZ who was in Hidalgo, Mexico. He stated once he was referred to HERNANDEZ, HERNANDEZ requested a recruitment fee of 25,000 Mexican Pesos, or approximately $1,400. The fee was paid directly to HERNANDEZ. Once this payment was made, HERNANDEZ took VICTIM2's Mexican passport which was held until he received his visa appointment in Monterrey, Mexico.

53.     VICTIM2 recalled while in Mexico, HERNANDEZ explained to him that the visa length was for approximately two to three months however he was required by contract with Las Princesas to work for a total of one (1) year.

54.     After receiving his H2A visa, VICTIM2 traveled from Mexico to the United States to Nassawadox, Virginia. VICTIM2 stated when he arrived in Virginia, ZEFERINO held a meeting with the workers. Also present at the meeting were HERNANDEZ, JEREMY and ZEFERINO's husband, "Jose" LNU. During this meeting with workers, ZEFERINO confiscated the workers' Mexican passports, provided them with a set of rules, discussed the work they would be doing, and discussed the meal arrangements.

55.     Some of the rules provided by ZEFERINO include, they were not to speak with people outside the group and were not to leave the hotel. It was explained they would be able to leave (the hotel) when JEREMY would take them shopping and cash their checks on Sunday.

56.     In this meeting, ZEFERINO explained workers were guaranteed two (2) meals a day. She acknowledged DOL they provide three (3) meals but only two (2) would be provided. She explained if DOL inquired, workers needed to say they were being provided three (3) meals

a day, six (6) days a week. ZEFERINO told them that, if they said differently, they could be sent back to Mexico.

57.     In the DOL LCA associated with VICTIM2's visa, I reviewed the *U.S. Department of Labor, H-2A Agricultural Clearance Order, Form ETA-790.* I reviewed *Section E. Provision of Meals, 1.* It states reference Las Princesas responsibilities, "For workers residing at the Motel, the employer will provide three meals per day at a cost to the worker of $13.17 per day….". In addition, a contract is included with TAQUERIA LA HAVIEND that was signed on September 2, 2021 by ZEFERINO which states that "…BETWEEN TAQUERIA LAS HACIEND (CATERER) AND LAS PRINCESAS CORPORATION (CLIENT) CATERER AGREES TO PROVIDE MEAL SERVICE TO CLIENT WORKERS. PROVIDER WITLL DELIVER THREE DEALS (MEALS) PER DAY SEVEN DAYS PER WEEK AT COST THE WORKERS OF $13.17 PER DAY. BETWEEN SEPTEMBER 13/202 AND DECEMBER 17/2021".

58.     Similar to VICTIM1, VICTIM2 described how he began work at a plant nursery several days after the initial meeting. While in Virginia, VICTIM2 generally worked Monday to Friday or Saturday each week from approximately 7:00 a.m. to 6:00 p.m. with two ten-minute breaks and one thirty-minute break each day. JEREMY transported the workers to and from the worksite and provided them instructions on what to do each day. Las Princesas paid VICTIM2 by check each week.

59.     Approximately one (1) week prior to November 17, 2021, VICTIM2 confronted ZEFERINO about the work situation and the treatment of the workers. He told her it was not legal. He recalled that ZEFERINO was angry and denied the accusations made by VICTIM2.

17

60.     Approximately November 17, 2021, HERNANDEZ came to VICTIM2's hotel room and instructed him to gather his belongings. VICTIM2 was transported by ZEFERINO, JEREMY, and ZEFERINO's husband from Virginia to North Carolina. He was not told why he was being moved or where he was being transported. He recalled ZEFERINO was driving the vehicle.

61.     VICTIM2 stated when he arrived in North Carolina he was placed in housing with other workers. He recalled there was a fridge and dining room table but nowhere to sit and there was no bed provided for him to sleep on. He stated he was not provided food when he first arrived but was later taken by one of the workers to purchase food.

62.     VICTIM2 recalled when he arrived in North Carolina, he still worked at a plant nursery, but he was paid under an identity other than his own. He explained the first paycheck he received in North Carolina was provided in the name of "Lucas Hernandez Hernandez," which is not VICTIM2's name. He was instructed to sign the check in this name by ZEFERINO's husband.

63.     VICTIM2 produced a copy of his paystubs to investigators. These were paystubs he received when he worked in Virginia and when he worked in North Carolina. I reviewed the paystubs during VICTIM2's time working in Virginia. The paystubs from the work in Virginia were from, "Martha Zeferino Jose Las Princesas Corportation" paid in the legal name of VICTIM2.  I observed on these particular paystubs that most do not have a social security number but rather "X's" in the place where numbers would be. However, on two of the paystubs provided by VICTIM2 there are partial social security numbers ending in 7353.  The paystubs from the work in North Carolina were from the company, "THE TERRA CEIA FARMS LLC"

18

paid in the name "Hernandez, Lucas Hernandez" with a social security number ending in 6381. The pay periods begin on November 12, 2021, through December 16, 2021.

VICTIM3

64.    On August 3, 2022, I conducted an interview with VICTIM3. VICTIM3 disclosed he had also come to the United States from Mexico on a H2A Visa. VICTIM3 identified the labor contracting company that petitioned for his visa as Las Princesas and the "boss" of the company as ZEFERINO. Through this petition, VICTIM3 was granted an H2A visa for a period of eight (8) months from March 2022 through December 2022.

65.    VICTIM3 stated he was introduced to HERNANDEZ in Mexico. He explained he was the individual coordinating with Las Princesas in the United States. He stated he was required to pay HERNANDEZ approximately 16,000 Mexican Pesos, or approximately $900, to be put on a "list" for work with the company.

66.    VICTIM3 stated prior to his visa interview in Monterrey, Mexico, HERNANDEZ provided him a document to sign. VICTIM3 explained this document was in English and HERNANDEZ provided it approximately 20 minutes prior to leaving for the interview.  This document was identified as United States Department of Labor H-2A Agricultural Clearance Order Form ETA-790.  VICTIM3 had a copy of this document in his possession during the interview and provided a copy to agents.

67.    I reviewed Form ETA-790, *Section, G. 1. Referral and Hiring Instructions* there are instructions provided to how prospective applicants may be considered for employment under the job order. This included contact information for the employer.  In this section, directions are provided to contact the career center for pre-employment screening before contacting the employer but those that are eligible will be made to "Jose Martha Zeferino

19

(252)375-5876…". *Section G. 2. Telephone Number to Apply* (252) 375-5876, *Section G. 3. Email Address to Apply* **SUBJECT ACCOUNT1**.

68.     VICTIM3 stated he traveled with a group of laborers from Mexico to Eastern Shore, Virginia, in March 2022. He stated after they arrived and before they began work, a meeting was held. He explained ZEFERINO and HERNANDEZ were two of the people present at this meeting. He stated that prior to the start of the meeting, ZEFERINO collected the passports and credentials of the laborers. He recalled that she stated that she was collecting their documents because some of the previous workers had left and that if they did leave immigration would be called. ZEFERINO further instructed them not to: (1) drink alcohol; (2) speak with people outside the group; (3) visit with any family in the area; or (4) leave the hotel unless driven by one of them.

69.     During the meeting, ZEFERINO also explained the workers would be required to pay $120.00 United States Dollars (USD) per week for meals.  I reviewed Form ETA-790, *Section, E. Provision of Meals*.  In this section the employer is required to describe how the employer will provide each worker with three (3) meals a day and/or furnish free and convenient cooking/meal facilities. Las Princesas filled out, *"For workers residing at the Motel, the employer will provide three meals per day at a cost to the worker of $13.17 per day…"*.

70.     VICTIM3 described how this group, after arriving in Virginia, similarly worked six days each week at a plant nursery from approximately 8:00 a.m. to 4:30 p.m. with two ten-minute breaks and one thirty-minute break each day. VICTIM3 and the other workers were transported to and from the worksite and provided with instructions on what to do each day.

71.     During a review of financial transactions associated with Las Princesas and ZEFERINO, a cashed check was made out to Las Princesas Corporation from James Durr

Wholesale Florist, Inc dated June 2, 2022.  The amount of the check was $50,276.29 United States Dollars (USD).  In February 2023, HSI and DOL-OIG received a subpoena return from James Durr, the president of James Durr Wholesale Florist Inc.

72.      I reviewed documents provided in the subpoena return. Several of these documents were email correspondence to JDURRFARM@ICLOUD.com from **SUBJECT ACCOUNT2**.  I reviewed an e-mail dated May 30, 2022, from "Jose Mari" with E-mail address: **SUBJECT ACCOUNT2** to "JDURRFARM@ICLOUD.com".  The subject line of the E-mail is: "I'm Martha" (ZEFERINO's first name).   In the body of the email there is a PDF attachment, "Farm Labor…rtificate.pdf".  The subsequent pages contain but are not limited to multiple Farm Labor Contractor Employee Certificates of Registration and tax forms.

73.      The first certificate is listed as, Farm Labor Contractor Employee Certificate of Registration, Employee Name: Martha Zeferno SSN: \*\*\*-\*\*-1828. The FLC Certificate Holder: LAS PRINCESAS CORPORATION.  The valid dates listed on the certificate are: "03/14/2021 – 03/13/2023" with an amended date of, "04/28/2022".  The address provided on this form is 414 Hackney Ave, Washington, North Carolina.  The second certificate is listed as, Farm Labor Contractor Employee Certificate of Registration; SSN: \*\*\*-\*\*-1828/EIN: \*\*-\*\*\*\*636; Representative Name: MARTHA ZEFERINO JOSE; Certificate Holder: LAS PRINCESAS CORPORATION. The valid dates listed on the second certificate are: "03/14/2021 – 03/13/2023" with an amended date of, "05/17/2022". The address provided on this form is 414 Hackney Ave, Washington, North Carolina.

74.      I reviewed an E-mail dated May 30, 2022, from "Jose Mari" with E-mail address: **SUBJECT ACCOUNT2** to "JDURRFARM@ICLOUD.com".  The subject line is blank. Included in the body of the email is a PDF attachment, "W-9.pdf". The subsequent pages contain

13 W-9 forms. These forms contain names, social security numbers, and the individual's signature with date. All forms due contain the address of 414 Hackney Ave, Washington, NC 27889.

75.     I reviewed an E-mail dated June 2, 2022, from "Jose Mari" with E-mail address: **SUBJECT ACCOUNT2** to "JDURRFARM@ICLOUD.com". The subject line is "Hey". Included in the body of the email is a PDF attachment, "PERMANEN…CARD-2.pdf". The subsequent pages contain multiple photocopies and/or scanned Permanent Resident Cards and Social Security Cards.

76.     I reviewed the attached copied of legal permanent resident ("LPR") cards and conducted a query in an immigration data base of the names, DOB's and alien registration numbers provided on the cards. Several of the identities provided on the cards returned to individuals with the same alien registration number but with a different name and associated social security number.  I also sent the photographs on the cards to DOS.

- The LPR card containing the name of Jose Angel Rafael and a DOB in 1991 contains a photograph that appears to match the individual, Jose Luis Angel Tomas, DOB in 1990, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8103.  The Visa was valid from September 2021 through December 2021.

- The LPR card containing the name of Isaac Leon Ventura and a DOB in 1982 contains a photograph that appears to match the individual, Pedro Trejo Ponce, DOB in 1981, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8103.  The Visa was valid from September 2021 through December 2021.

- The LPR card containing the name of Fernando Reyes Campos and a DOB in 1999 contains a photograph that appears to match the individual, Alberto Silva Arellanos, DOB in 2001, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8236.  The Visa was valid from November 2021 through December 2021.

22

- The LPR card containing the name of Cristian Gutierrez Sanchez and a DOB in 1996 contains a photograph that appears to match the individual, Juan Bautista Ruiz Hernandez, DOB in 1998, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8103.  The Visa was valid from September 2021 through December 2021.

77.     I also reviewed an E-mail dated June 2, 2022, from "Jose Mari" with e-mail address: **SUBJECT ACCOUNT2** to "JDURRFARM@ICLOUD.com".  The subject line is "He".  Included in the body of the email is a PDF attachment, "PERMANEN...T CARD.pdf". The subsequent pages contain multiple photocopies and/or scanned Permanent Resident Cards and Social Security Cards.

- The LPR card containing the name of Justin Hernandez Hernandez and a DOB in 1995 contains a photograph that appears to match the individual, Damian Ramirez Alvarez, DOB in 1993, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8236).  The Visa was valid from November 2021 through December 2021.

- The LPR card containing the name of Luis Hernandez Hernandez and a DOB in1991 contains a photograph that appears to match the individual, Tomas Rubio Velazquez, with a different DOB in 1991, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8103).  The Visa was valid from September 2021 through December 2021.

- The LPR card containing the name of Lucas Hernandez Rosales and a DOB in 1986 contains a photograph that appears to match the individual, Fermin Bautista Antonio, DOB in 1985, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8103).  The Visa was valid from September 2021 through December 2021.

- The LPR card containing the name of Fredi Cortez Zalguero with a DOB in 1994 contains a photograph that appears to match the individual, Fernando Perez Hernandez, DOB in 1993, who was issued an H2A visa through the DOS in Monterrey Mexico. The H2A petitioner is Las Princesas Corp with petition number ending in 8103).  The Visa was valid from September 2021 through December 2021.

78.     VICTIM4 and VICTIM5 that were interviewed provided similar accounts to VICTIM1, VICTIM2, and VICTIM3 including but not limited to, their identification documents being confiscated by ZEFERINO upon arrival to the United States, being worked past the expiration of their visa and being paid in names that were not their own.

**Information about E-mails and Storage of Data**

79.     I have learned from my training and experience that electronic mail communication service providers such as Microsoft (Hotmail) provide a variety of on-line services, including e-mail access and online storage service for a wide range of file types, to the general public. Subscribers obtain an account by registering with the email provider. During the registration process, the email provider asks subscribers to provide basic personal information. Therefore, the computers of the email provider are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for the subscribers) and information concerning the subscribers and their use of the email provider's services, such as account access information, e-mail transaction information, and account application information.

80.     In general, an e-mail that is sent to the email provider's subscriber is stored in the subscriber's "mailbox" on the servers of the email provider until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on the email provider's servers indefinitely.

81.     When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to the email provider's servers, and then transmitted to its end destination. The email provider often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the email provider's server, the e-mail can remain on the system indefinitely.

24

82.    A subscriber of the email provider can also store files, including e-mails, address books, contact lists, pictures, and other files, on servers maintained and/or owned by the email provider.

83.    Subscribers of the email provider might not store on their home computers copies of the e-mails and files stored in their email provider's account. This is particularly true when they access their email provider's account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

84.    In general, e-mail providers like Microsoft (Hotmail) ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account numbers).

85.    Providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of services utilized, the status of the account (such as logging into the account via the email provider's website), and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

86.    In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing

25

inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support.

**Conclusion**

87.        Based upon the foregoing information set forth in this application, I respectfully submit that there is probable cause to believe that contraband, and evidence, fruits, and instrumentalities of violations of the **SUBJECT OFFENSES** as set forth herein and in Attachment B is currently contained in the **SUBJECT ACCOUNTS**, which are more fully described in Attachment A. I therefore respectfully request that warrants be issued authorizing a search of the **SUBJECT ACCOUNTS** and the seizure of the items described above and in Attachment B.

88.        Further, because the warrant for the location described in Attachment A will be served on Microsoft electronically or by mail, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

Respectfully submitted,

Special Agent
Homeland Security Investigations

Sworn and subscribed to before me on
_____ May 5, 2023 _____ .

Hon. Robert J. Krask
United States Magistrate Judge

26

**<u>ATTACHMENT A</u>**
**ITEMS TO BE SEIZED AND SEARCHED**

This warrant applies to information associated with the following Microsoft

Corporation, Hotmail accounts:

1. marthazeferino@hotmail.com

2. josemari301@hotmail.com

that are stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company headquartered at One Microsoft Way, Redmond, WA 98052.

1

**ATTACHMENT B**
**PARTICULAR THINGS TO BE SEIZED**

**I.     Information, Files, and Accounts to be produced by Microsoft Corporation between January 2021 to the Present.**

Microsoft shall disclose responsive data within 14 days, if any, by sending to the Department of Homeland Security, Homeland Security Investigations, 200 Granby Street, Suite 600, Norfolk, Virginia 23510, ATTN: Special Agent Kristen Brewer or Kristen.Brewer@ice.dhs.gov, using UPS or another courier service, or email.

To the extent that the information described in Attachment A is within the possession, custody, or control of Microsoft Corporation including any messages, records, files, logs, images, videos, or information that have been deleted but are still available to Microsoft Corporation or have been preserved pursuant to a preservation request under 18 U.S.C. § 2703(f), Microsoft Corporation is required to disclose the following information to the government for each account or identifier listed in Attachment A:

**A.  Account Information**

1.  Microsoft account registration information, including name, user-specified contact information, recovery email address, recovery SMS number, account creation timestamp and IP address, and a list of services the account holder has enabled or accessed;

2.  The following information about the customers/subscribers of each account:

    a.  Names (including subscriber names, user names, and screen names);

    b.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    c.  Local and long distance telephone connection records;

    d.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    e.  Length of service (including start date) and types of service utilized;

    f.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services

2

Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

g.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

h.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

**B.   <u>Microsoft Account Data</u>**

1.      All Registration Details (information captured at the time of account registration)

2.      All billing information, including addresses and any payment instruments

3.      All billing transaction history

4.      All IP logs, including all IP addresses captured at the time of the user login to a specific service); and

5.      All services utilized

**C.   <u>Email Service Data</u>**

1.      All Registration Details (Information captured at the time of account registration)

2.      All IP logs, including all IP addresses captured at the time of the user login to a specific service);

3.      All Email Content

4.      All Email Contacts

**D.      <u>OneDrive Service Data</u>**

1.   Registration Details (information captured at the time of account registration)

2.   IIS Logs

3.   All Stored Files

## II.     Information to be Seized by Law Enforcement Personnel

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of 18 U.S.C. § 1546(a) - Fraud and misuse of visas, permits, and other documents; 8 U.S.C. § 1324(a)(1)(A)(ii) & (iii) - Harboring certain aliens; 18 U.S.C. § 1028(a)(1) & (4) - Fraud and related activity in connection with identification documents, authentication features, and information; 18 U.S.C. § 1589(a)(3) - Forced labor; 18 U.S.C. § 1592(a)(1) - Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor; and 18 U.S.C. § 1594(b) - Conspiracy to engage in forced labor and unlawful conduct with respect to documents including:

1. Images depicting the interior or exterior of residences, public establishments, and vehicles;

2. All images, messages, communications, calendar entries, and contacts, including any and all preparatory steps taken in furtherance of these crimes;

3. Communication, information, documentation and records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts;

4. Evidence of the times the accounts or identifiers listed on Attachment A was used;

5. All images, messages and communications regarding wiping software, encryption or other methods to avoid detection by law enforcement;

6. Passwords and encryption keys, and other access information that may be necessary to access the account or identifier listed on Attachment A and other associated accounts;

7. Credit card and other financial information, including but not limited to, bills and payment records evidencing ownership of the subject accounts and evidencing all payments received, made, or relating to farm labor and

transportation for the same;

8. Identification documents, immigration documents, and personally identifiable information;

9. All "address books" or other lists of contacts; and

10. All location data relevant to the investigation of the above-listed times.

### III.    The Government's Search

With respect to the search of the information provided pursuant to this warrant by the above-referenced provider, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically-stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.

If the government identifies seized materials, that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e. communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. If applicable for covert investigations: This investigation is presently covert and the government believes that the subject of the search is not aware of this warrant.